Stephen A. BACCUS, Plaintiff,

v.

**Arthur KARGER, Thomas M. Burke and John E. Holt–Harris Jr., Richard J. Bartlett and Laura A. Taylor, individually and in their official capacity as members of the New York State Board of Law Examiners; Sol Wachtler, Richard D. Simons, Judith S. Kaye, Fritz W. Alexander II, Vito J. Titone, Stewart F. Hancock, Jr., and Joseph W. Bellacosa, individually and in their official capacity as Judges of the New York State Court of Appeals, Defendants.**

No. 87 Civ. 2740 (GLG).

United States District Court, S.D. New York.

Aug. 17, 1988.

Goodstein & West, New Rochelle, N.Y. (Robert David Goodstein, Eileen West, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Howard L. Zwick-

el, Asst. Atty. Gen. in Charge, Litigation Bureau, Frederic L. Lieberman, Asst. Atty. Gen., of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

This case presents the interesting question of whether an otherwise qualified individual who has applied to take the New York State bar examination may constitutionally be denied that end solely on the basis of his or her youth.

The New York Court of Appeals, in addition to its other judicial functions as the highest court of the State, has been delegated the responsibility and authority for promulgating rules and standards governing eligibility for admission to the State bar. N.Y.Jud.Law § 53 (McKinney 1983). The Rules for Admission of Attorneys and Counselors at Law, N.Y.Comp.Codes R. & Regs. tit. 22, §§ 520.1–520.12 (1986) (the "Rules") have been promulgated pursuant to that authority. The Rules require, *inter alia*, that individuals applying to take the State bar examination must demonstrate to the Board of Law Examiners (the "Board") that the applicant (1) "is over 21 years of age," *id.* at § 520.2(a)(1), and (2) "commenced the study of law after applicant's 18th birthday," *id.* at § 520.3(a)(1).[1]

Plaintiff, a child prodigy, has been denied the opportunity to take the State bar examination on the basis of the above rules. He now challenges those provisions as violative of the Equal Protection Clause of the fourteenth amendment to the United States Constitution.[2] The defendants, sued in their individual and official capacities, are members of the Court of Appeals and the Board. The action is brought pursuant to 42 U.S.C. § 1983 (1982), and our jurisdic-

---

**1.** The Board is appointed by the Court of Appeals pursuant to N.Y.Jud.Law § 56 (McKinney 1983). Its principal tasks are to oversee the bar examination process and to certify as eligible for admission those who have passed the examination. *Id.* at § 464; N.Y.Comp.Codes R. & Regs. tit. 22, §§ 520.6 & 520.7 (1986).

**2.** The Equal Protection Clause provides that no State "shall deny to any person within its juris-

diction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is applicable in this case, which involves regulations rather than "laws" in the statutory sense, given its sweeping encumbrance over "all official actions." *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 457 n. 5, 99 S.Ct. 2941, 2946 n. 5, 61 L.Ed.2d 666, *reh'g denied,* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979).

tion is premised under 28 U.S.C. § 1343 (1982). In addition to declaratory and injunctive relief, plaintiff seeks costs and attorney's fees pursuant to 42 U.S.C. § 1988 (1982). Defendants, likewise, seek to recoup the costs they have incurred in defending this lawsuit.

The pertinent facts are not in dispute, and the issues appear ripe for summary judgment. The parties have so moved. For the reasons that follow, we grant plaintiff's motion as to the requirement that one's legal education may not commence prior to his or her 18th birthday, and we strike down that provision as unconstitutional. As to the second requirement—that one must be at least 21 years of age to sit for the bar examination—we find that such a requirement serves, de facto, as a threshold for admission to the bar and, as such, passes muster under the minimal standard of constitutional review pertinent to this action. Consequently, we grant defendants' motion for summary judgment on that count.

## I. FACTS

Plaintiff was born on February 25, 1969 in Dade County, Florida. In 1983, at the age of 14, plaintiff graduated from the University of Miami with a Bachelor of Science degree in computer sciences and mathematics. He was accepted that year for admission into the University of Miami School of Law, enrolling for classes in September. Plaintiff thus commenced his formal study of law at the age of 14 years and 6 months. He received his Juris Doctor in January of 1986, and has since been admitted to the Florida bar.

On January 12, 1987, plaintiff, now a resident of New York, submitted to the

Board an application for the February 1987 New York bar examination. His application correctly noted that plaintiff was then 17 years of age, and that he had begun his study of law at the age of 14. Because plaintiff had not yet reached 21 years of age and had entered law school before reaching the age of 18, the Board rejected plaintiff's application. It appears that plaintiff was otherwise qualified to sit for the February 1987 exam.[3]

The Rules provide that the Court of Appeals, in its discretion, "may vary the application of or waive any provision of these rules where strict compliance will cause undue hardship on the applicant." N.Y. Comp.Codes R. & Regs. tit. 22, § 520.12 (1986). The Chief Judge has delegated to Judge Simons of that Court the authority to make the necessary determinations on individual waiver petitions. Plaintiff filed a waiver petition with the Court, alleging undue hardship in that: (a) his accelerated studies and law degree from the University of Miami are rendered forever meaningless by the requirement that an applicant begin his or her study of law no sooner than that person's 18th birthday; (b) an applicant, including plaintiff, "is best able to pass the bar examination immediately after completing law school"; and (c) plaintiff would be forced "to abandon his home in New York in order to practice his chosen profession." That petition formally was rejected by the Court of Appeals on February 12, 1987. Judge Simons, in an affidavit accompanying defendants' motion papers, said he concluded that plaintiff, despite his considerable academic accomplishments, had not demonstrated the requisite "maturity and experience" to justify a waiver. Simons Aff. ¶ 16, at 8. This action followed.[4]

---

3. The requirements pertinent to this plaintiff generally are set forth at N.Y.Comp.Codes R. & Regs. tit. 22, § 520.3 (1986) which requires, *inter alia,* that an applicant successfully have completed and received a valid degree for a "full-time or part-time program" at an "approved law school" (terms defined therein). Receipt of a Juris Doctor degree from the University of Miami upon completion of a full-time course of study would appear to satisfy these requirements.

4. Plaintiff does not, as part of this action, appeal the denial of his waiver petition by the New York Court of Appeals. This court would have no jurisdiction over such an appeal, which must be taken directly to the United States Supreme Court. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476, 482–86, 103 S.Ct. 1303, 1311, 1314–17, 75 L.Ed.2d 206 (1983); 28 U.S.C. § 1257 (1982). We do, however, have jurisdiction over a general challenge to the constitutionality of the rules in question. *Feldman,* 460 U.S. at 482–83, 103 S.Ct. at 1314–16. It is by

## II.   DISCUSSION [5]

Few areas of constitutional jurisprudence have proven more intractable to the judiciary—in terms of establishing both a coherent and consistent analytical framework—than analysis under the Equal Protection Clause.   Whether there are one, two, or three standards of review, and in what order analysis should proceed, remain issues generating individual constituencies on the Supreme Court.[6]

The parties to this action concede that equal protection review of the bar-eligibility criteria at issue is governed by the "rational relation" standard.   *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) (dictum); *Shapiro v. Cooke*, 552 F.Supp. 581, 586 (N.D.N.Y.1982) (Miner, J.), *aff'd*, 702 F.2d 46 (2d Cir.1983) (per curiam). The fact that the criteria in question are age-based does not alter that conclusion.   *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–14, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976) (holding age-based classifications subject to rational review).[7]

The Supreme Court repeatedly has emphasized that the contours of analysis under the rational relation standard provide local regulators with wide latitude and flexibility.   Accordingly, we "presume" the constitutionality of the restrictions at issue, and we will strike down those criteria only if we find them to be "wholly arbitrary." *City of New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam).   *Accord City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).   Such deference is particularly appropriate here since regulation of the practice of law traditionally has rested within the purview of the States since the founding of the Republic. *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (per curiam), *reh'g denied*, 441 U.S. 956, 99 S.Ct. 2185, 60

virtue of the Court of Appeals' decision denying plaintiff's waiver petition that plaintiff has standing to maintain such a constitutional challenge.   *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982) (discussing "actual injury" standing requirement).

5.   As a preliminary matter, we note that defendants' answer alleges that this court has no jurisdiction over plaintiff's claims insofar as they are asserted against any of the defendants in their individual capacities.   This issue, however, was neither briefed nor argued on the instant motions.   Accordingly, it will not receive our attention.

6.   For two of the more recent, full-blown, internal debates on the subject, which periodically occupy the Supreme Court's attention, see *Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Despite continuing disagreements, one of the latest majority pronouncements on the subject states that the "logical first question" is to determine the appropriate level of scrutiny, *Soto–Lopez*, 476 U.S. at 906 n. 6, 106 S.Ct. at 2323 n. 6, and the Court, de facto or otherwise, has recognized three such levels of review.   Heightened or strict scrutiny is warranted when legislative action impinges upon suspect classes or funda-

mental rights.   *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16, *reh'g denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973).   Most other legislative action is subject to minimal judicial review under the rational relation standard, discussed *infra*, although a third tier or intermediate level of scrutiny has been recognized as appropriate in certain limited circumstances. *See, e.g., Mills v. Habluetzel*, 456 U.S. 91, 99, 102 S.Ct. 1549, 1555, 71 L.Ed.2d 770 (1982) (holding discrimination based on illegitimacy must be "substantially related to a legitimate state interest"); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976), *reh'g denied*, 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977) (substantial relation standard appropriate in evaluating gender-based discrimination).

7.   We note that, since the Second Circuit's affirmance of Judge Miner's decision in *Shapiro*, the Supreme Court has referred to the practice of law as a "fundamental right." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 281, 105 S.Ct. 1272, 1277, 84 L.Ed.2d 205 (1985). The Fifth Circuit, however, in reasoning we adopt, has distinguished this isolated reference (which was made in a different analytical context) and reiterated the long-held belief that strict scrutiny in bar-admissions cases is not warranted on a fundamental-right theory. *Nordgren v. Hafter*, 789 F.2d 334, 338 n. 2 (5th Cir.) (per curiam), *cert. denied*, 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986).

L.Ed.2d 1060 (1979).[8]

That said, we hasten to emphasize that rational review is not a paper tiger. It is true that regulatory action rarely is overturned under this standard, and this court certainly does not advocate a more activist intrusion of the "judicial second-guess" in legislative or regulatory matters that do not involve suspect classes or fundamental rights. Nonetheless, "the practice of law is not a matter of the State's grace," *Schware*, 353 U.S. at 239 n. 5, and we must at least satisfy ourselves that these age restrictions, taken separately or together, are "rationally related to furthering a legitimate state interest." *Murgia*, 427 U.S. at 312, 96 S.Ct. at 2566.

### a. The State's Interest

As the New York Court of Appeals emphasized long ago, "The reason why preparatory study, educational qualifications, experience, examination and license by the courts are required, is not to protect the bar ... but to protect the public." *People v. Alfani*, 227 N.Y. 334, 339, 125 N.E. 671 (1919). It is this overarching and legitimate interest in protecting the public against which regulatory action bearing on the instant issues must be measured.

The Rules require, *inter alia*, that all bar applicants possess "the good moral character and general fitness requisite for an attorney." N.Y.Comp.Codes R. & Regs. tit. 22, § 520.10 (1986). Naturally, these terms are not susceptible of precise definition, but one court has suggested that "general fitness" broadly refers to one's

"general experience in life." *In re Brennan*, 230 A.D. 218, 243 N.Y.S. 705, 715 (App.Div.1930). Put differently, an inquiry into one's general fitness, it seems to us, necessarily includes an attempted assessment of one's maturity. Consistent with *Alfani*, there can be no doubt that such an inquiry is rationally related to the State's legitimate interest in protecting the public from the vicissitudes of an incompetent bar. Indeed, plaintiff concedes this point. *See especially In re Griffiths*, 413 U.S. 717, 722–23, 93 S.Ct. 2851, 2855–56, 37 L.Ed.2d 910 (1973) (acknowledging State's "constitutionally permissible and substantial interest" in assessing a bar applicant's general fitness); *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 299 F.Supp. 117, 124–25 (S.D.N.Y. 1969), *aff'd*, 401 U.S. 154, 159, 91 S.Ct. 720, 724, 27 L.Ed.2d 749 (1971) (rejecting vagueness challenge to New York's requirement that bar applicants possess the "character and general fitness requisite for an attorney").

Further, it is our view that an age threshold, such as 21, may rationally be employed as a presumptive means of gauging maturity, a point plaintiff also concedes. *See United States ex rel. Chestnut v. Criminal Court of the City of New York*, 442 F.2d 611, 618 (2d Cir.), *cert. denied*, 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed. 2d 98 (1971) (rejecting equal protection challenge to requirement that county's grand jurors be at least 35 years of age). Consistent with this analysis, defendants note that at least forty States have adopted a minimum-age requirement for admission

---

8. Indeed, consistent with this deferential standard, courts have upheld a wide variety of bar-admission restrictions. *See, e.g., Nordgren v. Hafter*, 789 F.2d 334, 339–49 (5th Cir.) (per curiam), *cert. denied*, 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986) (upholding Mississippi rule denying bar admission to graduates of out–of–State, non–ABA–accredited law schools, even though similar restriction did not apply to graduates of in-State, non–ABA–accredited schools); *Jones v. Board of Comm'rs*, 737 F.2d 996, 1001–02, *reh'g denied*, 745 F.2d 72 (11th Cir.1984) (upholding Alabama rule limiting to five the number of times an individual may sit for the bar examination); *Lowrie v. Goldenhersh*, 716 F.2d 401, 409–10 (7th Cir.1983) (upholding Illinois rule allowing admittance of foreign-li-

censed attorneys only if applicant has resided and actively practiced law in the outside jurisdiction for five of the seven years immediately preceding application). As restrictions, by definition these criteria discriminate in some way. Discrimination, however, is not and has never been *per se* unconstitutional. Those who view "anti-discrimination" as an inviolate shibboleth around which the cause for equality can rally misunderstand, to some extent, the nature of both legislative action and the protection afforded by the Equal Protection Clause. Policy-making necessarily involves making choices or, put differently, discriminating in some fashion. In this case, those choices will be struck down as unconstitutional only if we find them to be without rational foundation.

to the bar, with seventeen such jurisdictions employing age 21 as the statutory threshold. VIII Martindale–Hubbell Law Directory, Part I (digest of State laws) (1988).

That said, plaintiff maintains that the current admissions scheme moves beyond these acceptable confines. He argues that the bar examination is strictly a measure of one's academic or intellectual competence, and that use of the age criteria in question are not rationally related to ensuring a sufficient level of either. In essence, he contends that, although a general fitness/maturity requirement for admission to the bar is reasonable, any sort of age-based requirement conditioning one's eligibility for taking the bar *examination* serves no rational end.

### b. The Requirement that One Must be at Least 21 Years of Age to Sit for the Bar Examination

Consistent with the above analysis, New York traditionally has employed a minimum-age requirement for admission to the State bar. The New York Constitution of 1846 provided: "Any male citizen of the age of twenty-one years, of good moral character, and who possesses the requisite qualifications of learning and ability, shall be entitled to admission to practice in all the courts of this State." N.Y. Const. of 1846, art. VI, § 8 (reprinted in 1 New York Constitution Annotated, Part II, at 57–62 (1938)).[9] Although that provision was deleted in a constitutional revision of 1869,[10] its substance was codified two years later by the New York Legislature, 1871 N.Y. Laws ch. 486. That statute, a predecessor of current N.Y.Jud.Law § 53 (McKinney 1983), delegated to the Court of Appeals general authority for promulgating rules and regulations governing admission to the bar, but expressly continued the proscription that only a "male citizen of the age of twenty-one years" could be admitted upon application if otherwise qualified. Thus, age 21 has been employed as a presumptive threshold for admission to the bar, in one form or another, since at least 1846. As made clear *supra*, we think such a requirement derives constitutional support.

It is true that the current admissions scheme operates somewhat differently. The age minimum is employed as a condition for taking the bar examination, rather than as a general requirement for admission. The practical effect, however, as we will demonstrate, is the same. Consequently, the scheme remains on firm constitutional footing.

Admission as an attorney in the State of New York generally comprises a four-step process. An applicant must have: (1) graduated from an approved program of legal study; (2) passed the State bar examination; (3) passed the ethics examination administered by the National Conference of Bar Examiners; and (4) submitted proof demonstrating that the applicant possesses the requisite good moral character and general fitness to practice law. N.Y.Comp. Codes R. & Regs. §§ 520.3, 520.6, & 520.10 (1986).[11] Plaintiff correctly notes that "the determination of general and legal educational qualification has traditionally been kept separate and apart from the co-ordinate determination as to character and general fitness." *Shaikh v. Appellate Div. of the Supreme Court*, 39 N.Y.2d 676, 680, 385 N.Y.S.2d 514, 516, 350 N.E.2d 902, 904

---

**9.** The constitutional debate resulting in adoption of the 1846 provision is an interesting bit of New York history which we recount *infra*, Appendix.

**10.** N.Y. Const. of 1846, art. VI (1869) (reprinted in 1 New York Constitution Annotated, Part II, at 76–84 (1938)). The deletion probably resulted from a belief that such a requirement, whatever its merits, was unworthy of "constitutionalization." *See infra* Appendix (discussing genesis of the original constitutional requirement).

**11.** An applicant may also qualify to take the bar examination if he or she has attained certain practical experience in lieu of formal academic training, N.Y.Comp.Codes R. & Regs. tit. 22, § 520.4 (1986), and an applicant who has studied law in a foreign country may also qualify under certain conditions, *id.* at § 520.5. In addition, an applicant may be admitted without examination if, *inter alia*, that individual has been admitted to and practiced before the highest court of another State for at least 5 of the 7 years immediately preceding his or her application. *Id.* at § 520.9.

(1976). It is the job of the Board of Law Examiners to evaluate applicants on the basis of bar-examination results, while determinations as to character and general fitness are made by committees on character and fitness appointed by the various appellate divisions of the State Supreme Court. It does not follow, however, that simply because administrative determinations bearing on these separate criteria are made by different entities that the criteria can be treated as unrelated requirements. Indeed, as the Court of Appeals plainly articulated to the contrary, these are *"coordinate* determination[s]." *Id.* (emphasis added).

As part of an integrated admissions process, therefore, we cannot say that the 21–year-old requirement is irrational. An admittee generally seeks admission immediately upon passing the bar examination, and for good reason—there are no professional advantages attaching solely by virtue of passing the bar examination. The examination is taken for the singular purpose of gaining admission to the bar. Indeed, a careful review of the waiver petition filed by plaintiff with the New York Court of Appeals implicitly confirms this reality. The petition claims that in being denied the opportunity to take the bar examination plaintiff will be forced "to abandon his home in New York in order to practice his chosen profession." Passage of the bar examination alone, however, will not allow plaintiff or anyone else to practice his or her chosen profession in this State; an applicant must still pass a character and general fitness review (which, plaintiff concedes, is a legitimate requirement and which, we reiterate, has been sustained by the Supreme Court on both equal protection and first amendment grounds, *Griffiths*, 413 U.S. at 722–23, 93 S.Ct. at 2855–56 and *Law Students*, 401 U.S. at 159, 91 S.Ct. at 724). The harm alleged by plaintiff in his waiver petition, therefore, implicitly recognizes the interrelationship between taking the bar examination and admission to practice law.

Consequently, in the typical case (*i.e.,* an applicant who has attended law school sometime after graduating from college, takes the bar examination upon graduating from law school, and then immediately seeks admission to the bar), the requirement that one must be at least 21 years of age before taking the bar examination serves, de facto, as a requirement that one be 21 years of age before being admitted to the bar. In the atypical case, an applicant is allowed to seek waiver of an onerous admissions requirement, although, as is obvious here, that applicant can expect his or her waiver petition to be viewed in the context of the overall admissions scheme and its goals.[12] That scheme, in our view, is not "wholly arbitrary." *Dukes*, 427 U.S. at 304.

Indeed, to a large extent plaintiff's challenge to the 21–year-old requirement amounts to a quibble. He insists that he be allowed to take the bar examination, yet no professional advantage attaches thereto and he concedes that a 21–year-old admissions requirement could legitimately doom his bar application. Although, as discussed *infra*, we understand fully plaintiff's interest in voiding the requirement that one must be at least 18 years of age before beginning law school, we are unable to answer a nagging question as to this challenge: "What's the point?"

In seeking to answer that question, plaintiff contends that if he is not allowed to take the bar examination now he will be injured in that the law may change and his academic skills may dull in the years leading to his 21st birthday, thus placing him at a competitive disadvantage with his academic contemporaries. As he put it in his waiver petition submitted to the Court of Appeals, a bar applicant "is best able to pass the bar examination immediately after

---

**12.** We note that the current requirement already contemplates some accommodation for advanced students. Common experience suggests that the typical admittee graduated from high school between the ages of 17 and 18, graduated from college between the ages of 21 and 22, and, sometime thereafter, attended a three-year or four-year program of legal study. Thus, that person is at least 24 or 25 years of age when he or she seeks admission—a full 3 or 4 years above the current requirement.

completing law school." We are distinctly unimpressed with this argument and think that it undercuts rather than supports plaintiff's case.

It is true (somewhat to our surprise) that there is no requirement that one seek admission to the bar within some specified time frame following passage of the bar examination. Nonetheless, the clear meaning of the Rules, consistent with historical precedent dating from 1846, is that, in the interests of protecting the public, a bar admittee must be at least 21 years of age. Since, for the reasons outlined *supra*, it is validly assumed that one will seek admission immediately upon passing the bar examination, the Rules simply require that one may not take the bar examination prior to his or her 21st birthday. Thus, although there may be no express requirement temporally linking the examination with admission, one is implied by the typical sequence of events.

Moreover, the central idea of testing applicants, it seems to us, is to determine, as objectively and fairly as possible, the prospective admittee's intellectual qualifications *at the time of one's application for admission*. To permit the sequence sought by plaintiff (*i.e.*, allow him to take the examination today because he may not be as qualified to do so tomorrow) would surely undermine this evaluation and runs counter to the State's interest in protecting the public. We cannot countenance such a pernicious result, even though it might technically be possible under the Rules.

Perhaps the Rules could be tightened to require that admission to the bar be sought in close temporal proximity to one's passage of the bar examination.[13] The fact

that the Rules might be improved, however, does not provide a sufficient basis for the judicial scuttling of the scheme now in place. A legislative or regulatory scheme need not be perfect, nor need it address all problems in a given area. *See Murgia*, 427 U.S. at 316, 96 S.Ct. at 2568 (that "the State perhaps has not chosen the best means to accomplish this purpose" is not fatal); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, *reh'g denied*, 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970) (no equal protection violation "merely because the classifications made by its laws are imperfect"); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911) (divisions need not be made with "mathematical nicety"). Moreover, that we think local regulators may have been "unwise in not choosing a means more precisely related to [their] primary purpose is irrelevant." *Vance v. Bradley*, 440 U.S. 93, 109, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979). It is not within the purview of this court "to substitute our personal notions of good policy for those of [state regulators]." *Schweiker v. Wilson*, 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1980). If changes are to be made to perfect the system, they must be made by the State's regulators, not through the imprimatur of this court.[14]

The thrust of this requirement, in our view, is to help ensure that the New York bar possesses the requisite maturity to interact with clients and serve as effective advocates of their clients' interests. By requiring that one be at least 21 years of age to be eligible to sit for the bar exami-

13. We suspect, for the reasons outlined *supra* (i.e., that no professional advantage attaches merely by passing the bar examination), that there is rarely a significant gap between one's examination and ultimate application for admission. Nonetheless, a requirement that one seek admission in close temporal proximity to passage of the bar examination would close whatever loophole exists and would help assure the public that the admittee has recently demonstrated his or her academic qualifications.

14. Indeed, there may be other aspects of the Rules which need "tightening." A recent report

issued by a committee of The Association of the Bar of the City of New York recommended that additional educational strictures be placed on foreign-educated applicants. Kohn, *Foreign Lawyers in N.Y. Found Lacking in U.S. Law*, N.Y.L.J., July 15, 1988, at 1, col. 1. We recently took notice of the fact that lawyers have a penchant for seeking social change through the courts rather than through the normal political processes, *Orozco v. Sobol*, 674 F.Supp. 125, 132 n. 9 (S.D.N.Y.1987), but regulatory amendment remains, in our view, the best avenue available for perfection of the scheme in question.

nation, the Court of Appeals has, de facto, set age 21 as a threshold for admission to the bar—using the age level as a presumptive gauge of maturity. A waiver option exists for exceptional cases. We cannot say that such a scheme is irrational and, thus, we grant defendants' motion for summary judgment on this issue.

### c. The Requirement that One be at Least 18 Years of Age Before Beginning Law School

■ As to the requirement that one's legal education commence no sooner than his or her 18th birthday, plaintiff's argument has more bite.

The defendants contend that persons under the age of 18 generally do not possess the maturity and experience needed to "sufficiently appreciate and understand the myriad factors and complexities found in the law and the critical importance of attorneys in practicing law and counseling clients." Defendants' Brief, at 20. Judge Simons, in his affidavit, puts it this way: "[T]he Court has determined that an applicant's legal education, which will be employed together with the experience and maturity of the attorney to advise and counsel clients, is best pursued when it is commenced after his or her 18th birthday so as to ensure a proper understanding of the law itself and of the critical importance of the role of the attorney in advising and counseling his or her clients." Simons Aff. ¶ 8, at 4. Although, as made clear above, this determination must be given considerable deference, the "rational-basis standard is 'not a toothless one.' " Schweiker, 450 U.S. at 234, 101 S.Ct. at 1082 (quoting Mathews v. Lucas, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976)).

Simply put, we are not satisfied that this requirement rationally advances New York's legitimate interest in protecting the public from the pitfalls of professional immaturity.

Defendants, in support of the current rule, note that even in the 18th and 19th centuries the Court of Appeals prohibited would-be lawyers from beginning their legal training before their 17th birthday. The current 18–year–old requirement, they contend, is consistent with that historical and justifiable precedent. We see a significant distinction, however, between past and present educational practices.

As alluded to *infra* Appendix, well into the 19th century a clerkship or apprenticeship with a practicing attorney was the principal manner in which a young man obtained his legal education (and, at that time, it was only an option available to men, a circumstance that fortunately has given way to enlightenment). Although many of the tasks assigned to law clerks were menial, a clerk often assisted in preparing actual legal documents. In addition, he often worked directly in his tutor's office, and, consequently, it is not unreasonable to assume there was at least limited contact with clients.[15] In recognition of the hands-on nature of this experience (and, for that matter, as a hedge against fathers rushing their sons into the family business at too early an age), a minimum-age requirement, in our view, was and remains a rational component of an apprenticeship educational scheme. Transposing that logic to the current system of legal education in which law schools play the predominant role is a different matter.[16]

---

**15.** For some interesting reading on the life of a law clerk, see P. Hamlin, Legal Education in Colonial New York (1939); McKirdy, *The Lawyer as Apprentice: Legal Education in Eighteenth Century Massachusetts*, 28 J. Legal Educ. 124 (1976).

**16.** Law schools first ascended to prominence in the last half of the 19th century in response to the perceived inadequacies of the clerkship system, although their rise was not truly consolidated until after the turn of this century. Jessup, *Legal Education in New York*, in History of

the Bench and Bar in New York 178–90 (1897); Chambers, *Who Needs Law School to Become a Lawyer?*, Nat'l L.J., May 2, 1988, at 1, col. 1 (discussing legal apprenticeships and the rise of law schools). New York still maintains a modified clerkship program and, consistent with the historical precedent defendants inaptly seek to borrow for present purposes, that program retains a minimum-age requirement (age 18). N.Y.Comp.Codes R. & Regs. tit. 22, § 520.4 (1986).

Law schools are not in the maturity business; their mission—and many of them do it well—is to inculcate their students with an understanding of the precepts and principles that are the lifeblood of the law. With the singular exception of clinical programs (where a student may have supervised contact with clients), and perhaps a course in ethics, there is no minimum quantum of maturity needed to comprehend such bedrock doctrine as *res ipsa loquitur* or the Rule Against Perpetuities (to the extent the latter can be comprehended by even the most mature of individuals). There is a clear distinction between possessing the academic skills needed to understand the law and demonstrating the character and maturity needed to practice it. *See especially Shaikh*, 39 N.Y.2d at 680–81, 385 N.Y.S.2d at 516, 350 N.E.2d at 905 (*recognizing the dichotomy between intellectual qualifications, which are measured by the bar examination, and general fitness, which is measured by inquiry into one's character and integrity*).[17]

Further, the assertion that this minimum-age requirement is supported by the notion that one needs a certain maturity to properly assimilate legal instruction is a self-defeating proposition. Plaintiff has received his Juris Doctor from a university recognized as an "approved" school by the State of New York, *supra* note 3. That university has judged him competent in his intellectual pursuits. If New York's recognition of "approved" law schools is to mean anything, a school's evaluation of its student's academic abilities must be given appropriate weight. Indeed, plaintiff's successful completion of an approved course of study is, to the court's mind, *prima facie* support for a conclusion contrary to that espoused by defendants. Presumably, if defendants are correct, those academic deficiencies stemming from plaintiff's alleged immaturity would manifest themselves in classroom examination. Plaintiff's degree is proof positive that he, and others like him, is entitled to the same academic recognition achieved by his older, fellow graduates.

Just as importantly, and consistent with the Court of Appeals' decision in *Shaikh,* we emphasize that whatever interest the State has in ensuring that prospective admittees have received a meaningful education is satisfied by the State's ability to test applicants through the bar examination. Its interest in ensuring that applicants are sufficiently mature is satisfied by the character and general fitness review.

Additionally, we note that the equities on this issue certainly cut in favor of plaintiff and others similarly situated. If defendants' argument is taken to its tautological conclusion, this plaintiff and others like him will *never* be qualified to take the New York State bar examination.

Judge Simons' affidavit notes that "it is the Court's judgment that general adherence to these Rules is *essential,*" Simons Aff. ¶ 9, at 4 (emphasis added), and he later refers to "the Rules' *strict* age requirements." *Id.* ¶ 16, at 7 (emphasis added). That the Court of Appeals views the 18–year–old requirement as a virtual hard-and-fast rule is evidenced to some extent by the fact that Judge Simons denied plaintiff's waiver application on the papers; no interview was provided.[18] Thus, although plain-

---

**17.** It implicitly follows, we suppose, from defendants' position that the bar examination somehow measures an applicant's maturity. That is a proposition we flatly reject. Correctly answering a multiple-choice question on enterprise liability or drafting a coherent essay on intestate succession is hardly a reliable gauge of one's maturity.

**18.** Whether a determination on one's maturity can fairly be made solely on the submission of a written waiver petition, or whether Judge Simons' decision in this case was proper, are issues not before us. *See supra* note 4 (discussing our jurisdictional limits in this case). It

bears repeating, however, that plaintiff chose not to appeal the denial of his waiver petition but instead initiated this constitutional challenge to the Rules. Whatever the merits of plaintiff's never-pursued individual appeal, his broader attack on the constitutionality of the Rules presents different issues.

We note, in passing, that plaintiff currently is employed by Emanuel Law Outlines, Inc. in Larchmont, New York. Some might perceive a certain irony in this state of affairs—while New York denies plaintiff the opportunity to be admitted to the State bar, he helps prepare legal outlines that will be used by students, certain of

tiff may at some future date be able to demonstrate that he has *attained* the requisite maturity to practice law, he will never be able to show that he *possessed* the requisite maturity to assimilate his legal education at the time he attended law school. That option was foreclosed, de facto, when Judge Simon, in denying plaintiff's waiver application, found that plaintiff "had not presented sufficient facts to demonstrate ... that he possessed sufficient maturity and experience so as to satisfy the purposes of [the] Rules and warrant their waiver." *Id.* ¶ 16, at 8. When and how, one might rhetorically ask, could plaintiff or others like him present such "sufficient facts" at a future date? Unless such individuals can re-enroll in law school upon reaching their 18th birthday and again pass an approved course of study, their applications to sit for the bar examination will always be "deficient." At minimum, the "solution" suggested (*i.e.*, that one begin from the beginning—again) is highly inequitable.[19]

Moreover, it is beyond cavil that New York has no interest, *per se*, in regulating the legal education of students in other States. Plaintiff was born in Florida, grew up there, attended law school at the University of Miami, and is admitted to the Florida bar. When such a person subsequently moves to New York, it seems particularly onerous for New York to reach back into that person's past and retroactively say when he or she should have attended law school. We have before us only a challenge under the Equal Protection Clause, but such a requirement may implicate other constitutional concerns.

In a case governed by the rational relation standard, we may look beyond the proffered justifications and craft our own in seeking to save the governmental regulation at issue. *McGowan v. Maryland,*

366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). We can devise none. Simply put, we think the prospective Mozarts of the legal profession deserve better. Although their practice in the profession may legitimately and temporarily be delayed, their academic achievements should not be stripped of their substantive meaning simply because they, by virtue of their precociousness, were able to pursue those rigors at an early age.

For all of these reasons, we grant plaintiff's motion for summary judgment on this issue, and strike down as unconstitutional the requirement that one be at least 18 years of age before commencing his or her legal study.

## Conclusion

One of this country's most esteemed jurists once remarked that "[line-drawing] seems arbitrary.... But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of [local regulators] must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (Holmes, J., dissenting). As even plaintiff here concedes, the State has a legitimate interest in establishing a general fitness/maturity requirement as a precondition for admission to the bar. Although such a line cannot, by its very nature, be drawn with mathematical exactitude, we believe that a minimum-age requirement is rationally calculated as a presumptive gauge of maturity. Here, by requiring that bar-examination applicants be at least 21 years of age, the State, de facto, has established age 21 as a minimum threshold for admission to the bar in the typical case. We find that this scheme is

whom will undoubtedly gain admission to the bar in this State.

**19.** This is particularly so since, unlike simply passing the bar examination, certain employment or other benefits may inure solely upon graduating from law school. Indeed, some people attend law school with no intention of ever becoming lawyers (although, undoubtedly,

those intentions sometimes change). Whatever one's original intentions in attending law school, it seems inherently unfair to require a child prodigy who has successfully completed an approved course of study to repeat that exercise if the degree is to be accorded professional significance.

reasonably tailored to serve the State's legitimate interest in protecting the public.

As to the requirement that one must be at least 18 years of age before beginning law school, we think the State has overreached the bounds of its discretion. Testing eligible applicants satisfies the State's interest in ensuring that prospective admittees are academically qualified; establishing minimum-age requirements for the pursuit of legal scholarship does not. Accordingly, we strike down that requirement as violative of the fourteenth amendment's command of equal protection.

Both sides request costs and attorney's fees, and both requests are denied.

The clerk will enter judgment accordingly.

SO ORDERED.

## APPENDIX

Of the changes wrought by the Constitutional Convention of 1846, one commentator has suggested that "the most profound," manifested in article VI of the 1846 Constitution, was the radical reshaping of the judiciary by providing for electoral accountability of state judges. Fowler, *Constitutional and Related Aspects, from 1801 to the Constitution of 1894*, in History of the Bench and Bar in New York 159 (1897). That same writer suggested that the change was the product of dissatisfaction with the former, appointive system and was symptomatic of the growing franchise beyond freeholders. *Id.* at 157.

Similar dissatisfaction apparently spilled over to include the subsumed issue of licensing attorneys. In colonial New York, as was the case in most of the colonies, would-be barristers received their legal training through an apprenticeship or clerkship with a then-practicing attorney. These apprenticeships or clerkships and the ultimate licensing of attorneys were matters largely regulated by the courts. *See generally* P. Hamlin, Legal Education in Colonial New York (1939). It appears that this system was of dubious educational merit and, further, spawned something of an "old-boy network" which, by the time of the 1846 Convention, had generated considerable resentment amongst a growing populist citizenry. That disdain was evidenced early on in the Convention's proceedings when Enoch Strong, a farmer from Monroe County and delegate to the Convention, offered the following resolution (which was approved):

Resolved, That the committee on rights and privileges be instructed to inquire into the expediency of reserving to the people the dormant right of freely choosing their counsel and attorneys in all courts of law, with the like freedom from state interference that they now enjoy in the selection of their spiritual advisers, and of their legislators, delegates, and governors; so that the anti-republican usage by means of which a close and gainful monopoly of the legal profession has hitherto been secured by a well organized order of licensed advocates and solicitors to the exclusion of the rest of community, may speedily cease.

Debates and Proceedings in the New–York State Convention, for the Revision of the Constitution 72–73 (1846). Nonetheless, the constitutional draft originally reported to the Convention floor implicitly adopted the then-existing system by providing that judges "shall not exercise any power of appointment, except in licensing practitioners in their courts." *Id.* at 575.

Not surprisingly, Mr. Strong moved at an appropriate time to strike that provision and replace it with the following: "Nor shall they [judges] prohibit any citizen from practising as attorney and counsellor in any court, except for want of good moral character." *Id.* at 576. Strong's amendment was sweeping in its simplicity—it would have eliminated all educational or other restrictions imposed on those seeking to practice law in New York, save the requirement that all practitioners possess "good moral character." Indeed, as Strong plainly argued, his aim was to open up the profession and allow complete individual freedom in choosing legal representation. *Id.* (statement of Mr. Strong).

The ensuing debate bared the bitter divisions separating the delegates on the issue.

One delegate, a lawyer, urged that such a matter was not appropriate for inclusion in the State's Constitution, adding sharply that "[h]e could not yield to any paltry prejudices of this kind." *Id.* (statement of Mr. Loomis). Another similarly termed the amendment a "miserable cry against lawyers as a profession." *Id.* (statement of Mr. Brown). In a backhanded vote of support, one delegate said he thought that the current licensing system was a needed protection for the public; "but if the public desired to play with edged tools, let them do it, and cut their fingers if they chose." *Id.* (statement of Mr. Crooker).

Given the acrimonious debate, and apparently convinced that his amendment was doomed, *id.* at 646 (statement of Mr. Strong), the Monroe farmer withdrew his original offering and submitted a substitute in its place—the substance of which would become the provision of the 1846 Constitution described in our opinion. As summarized by the Convention's reporters, the comments of one supporter (a lawyer himself) demonstrated the contempt with which certain people viewed the then-existing system of licensure:

> He regarded [Mr. Strong's amendment] as calculated to rid the profession of a class who by virtue of their parchment and blue ribbon only, were admitted to practice—(for the examination was a mere form)—and through whose ignorance or negligence many a just cause had been lost. He preferred to leave suitors to choose their own counsel instead of being forced, as they often were now, to employ ignorance or indolence or both, and suffer the consequences.

*Id.* at 577 (statement of Mr. Murphy). The amendment passed by a vote of 60–17, although one delegate reiterated the belief that "it was preposterous to have such a thing in the constitution." *Id.* (statement of Mr. Patterson). A later attempt to strike the provision failed. *Id.* at 826–27.[21]

Although Strong's amendment was deleted in a constitutional revision adopted in 1869 (presumably those who viewed this as a matter for the legislature rather than the constitution finally won out), the legislature, as noted in our opinion, codified the substance of the provision in 1871.

Thus, in a marriage between populism and general disdain for the legal profession was the 21–year–old requirement born. With recent polls indicating that lawyers currently enjoy especially low esteem in the eyes of the public, it appears that the past is, to some extent, prologue. The important point for the case at bar, however, is that even amidst this egalitarian attempt to open wide the doors to the legal profession there existed a recognition that lawyers need possess a certain maturity and savvy in carrying out their responsibilities, and that age 21 is an appropriate, presumptive threshold in that regard. Our opinion holds today that not only is such a threshold intuitively appropriate, but it is constitutionally firm and withstands scrutiny under the Equal Protection Clause.

---

**21.** Mr. Crooker's role in all of this is an interesting sidelight. It appears that Crooker—he of the "edged tools" comment—drafted the substitute offered by Strong which eventually became law. It was an action he may later have regretted for a local newspaper excoriated Crooker, alleging that, for public consumption, he disingenuously supported the original Strong amendment while privately he worked amongst the delegates for its demise. Debates and Proceedings in the New York State Convention, for the Revision of the Constitution 646 (1846). Crooker would later take to the Convention floor to publicly denounce this "direct and positive falsehood," *id.* (statement of Mr. Crooker), asserting that he supported throughout the effort to "liberalize the old and rigid rule." *Id.* at 647 (statement of Mr. Crooker). It was only after he became convinced that Strong's original amendment lacked sufficient support that he drafted the substitute, which he deemed to be a considerable improvement over the then-existing system. *Id.* Strong graciously confirmed this sequence of events, *id.* at 646 (statement of Mr. Strong), although doubtless this clarification lacked the notoriety of the original story—much to Crooker's chagrin.